UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| DEANN GRAHAM, | |
| Plaintiff, | |
| v. | CAUSE NO. 3:19-CV-386 DRL |
| COCA-COLA CONSOLIDATED, INC., | |
| Defendant. | |

OPINION AND ORDER

In 2016, Coca-Cola Consolidated, Inc. (CCCI) hired DeAnn Graham, an African-American woman who is now 49 years old, as a merchandiser at its facility in South Bend, Indiana. In March 2018, CCCI terminated her employment. She filed this *pro se* lawsuit against CCCI, claiming that she was fired because of her race, sex, age, and in retaliation for her complaints in violation of Title VII of the Civil Rights Act of 1964 and the Age Discrimination in Employment Act. CCCI requests summary judgment. The court grants the motion.

BACKGROUND

In 2016, as a CCCI merchandiser, Ms. Graham was responsible for driving her personal vehicle on a daily route to grocery stores to merchandise various CCCI products [ECF 114-1 ¶ 6]. She stocked the store shelves and coolers with CCCI beverages [*id.* ¶ 7]. In 2017, Aaron Ridge became the merchandising supervisor of the South Bend facility [*id.* ¶ 4]. She reported directly to him [*id.* ¶ 5]. Mr. Ridge reported to the district sales manager, William Leinart [*id.* ¶ 4].

On December 13, 2017, CCCI held a mandatory onsite meeting to inform its employees of a change in pay structure from an hourly rate to a daily rate [ECF 114-2 ¶ 4]. Janise Moeller (Human Resource Business Partner), Brad Keinsley (Director of Retail Sales), and Todd Marty (then Indiana Market Unit Vice President) presented at the meeting [*id.* ¶¶ 2, 4-5]. CCCI calculated the daily rate of

each employee using the employees' gross pay for 2017 [*id.* ¶ 6]. Since the calculations began in December 2017, CCCI only used the first three quarters of 2017 to calculate the daily rates [*id.*].

Under the new pay structure, Ms. Graham's daily rate amount was $128.73 [*id.* ¶ 8; ECF 114-1 ¶ 8]. Ms. Graham complained that CCCI calculated her daily rate incorrectly and that she should have been receiving more than $128.73 per day [ECF 114-1 ¶ 10; ECF 114-2 ¶ 9]. On January 18, 2018, CCCI distributed the South Bend pay statements to all merchandisers, including Ms. Graham, which explained how the new daily rates were calculated [ECF 114-2 ¶ 10].

On January 30, 2018, Ms. Moeller, Mr. Keinsley, Mr. Marty, and Jessica Quinn (CCCI's Area Sales Manager) met with Ms. Graham in person to explain to her the new pay rate and address her concerns [*id.* ¶ 11]. Ms. Graham continued to insist that the pay rate was incorrect [*id.* ¶¶ 12-13]. During the meeting, she explained that she was experiencing financial hardship as a single mother [*id.* ¶ 14]. She didn't say her complaints regarding her pay were due to her race, sex, or age [*id.* ¶ 15].

Thereafter, Mr. Marty and Diane Borella (CCCI's Human Resources Director) participated in additional meetings with Ms. Graham to address concerns about her pay [*id.* ¶ 16; ECF 114-3 ¶ 9]. Ms. Borella provided Ms. Graham with a spreadsheet charting Ms. Graham's pay history in 2017 to show her that CCCI had calculated her daily rate correctly [ECF 114-3 ¶ 10]. Mr. Marty and Ms. Borella encouraged Ms. Graham to apply for the Coke Hardship Program, which provides a one-time grant to employees who find themselves in unforeseen financial hardship [*id.* ¶ 11; ECF 114-2 ¶ 17].

On February 3, 2018, Ms. Graham emailed her application for the Coke Hardship Program to David Greenberg (then Senior Director of Human Resource Operations) [ECF 114-4 ¶ 7]. In her email to Mr. Greenberg, she said she was earning less pay under CCCI's new pay structure, but she didn't say the change in pay was due to her race, sex, or age [*id.* ¶¶ 8-9]. CCCI provided Ms. Graham with financial assistance in the amount of $1,850.00 [*id.* ¶ 16; ECF 114-2 ¶ 19; ECF 114-3 ¶ 15]. Ms. Graham had also remarked that she could not afford to pay for her daughters' participation in school

2

music programs [ECF 114-2 ¶ 20]. In response, CCCI sponsored the music programs at her daughters' schools, donating $700.00 to Northside Junior High School's music program and $300.00 to Elkhart High School's music program [*id.*; ECF 114-3 ¶ 15; ECF 114-4 ¶ 17].

On February 22, 2018, CCCI changed the routes for merchandisers to improve efficiency and timeliness of services [ECF 114-1 ¶ 11]. Ms. Graham complained to Mr. Ridge and Mr. Leinart that she didn't have gas money to complete her new route and that the new route ended farther away from her daughter's school [*id.* ¶¶ 11-12]. Mr. Ridge and Mr. Leinart reviewed the route analysis and determined that Ms. Graham was not impacted any differently than the other merchandisers who received a route change [*id.* ¶ 13]. They explained to Ms. Graham that the route change was for business reasons [*id.*].

Ms. Graham thereafter emailed Mr. Greenberg to complain about her route change [ECF 114-4 ¶ 19]. Mr. Greenberg called her and explained that she was not being treated any differently than the other merchandisers [*id.* ¶ 20]. After their phone call, Ms. Graham sent Mr. Greenberg another email, further complaining that CCCI was sabotaging her pay and causing hardship to her family [*id.* ¶ 22]. Ms. Graham never stated that CCCI's decisions regarding her pay and her route were due to her race, sex, or age [*id.* ¶ 23].

CCCI required merchandisers to complete monthly safety trainings by the end of each month [ECF 114-1 ¶ 14]. If an employee didn't complete the training by the 15th of the month, then the employee's supervisor would arrange a time for the employee to come to the facility and complete the training during work hours [*id.*]. In February 2018, Ms. Graham didn't complete the mandatory safety training by the 15th of the month [*id.* ¶ 16]. Her supervisor, Mr. Ridge, arranged for her to report to the facility and complete the training in person on February 27, 2018 [*id.*]. Ms. Graham didn't show up to the facility to complete the training that day [*id.* ¶ 17].

3

Mr. Ridge and Mr. Leinart called Ms. Graham to ask why she didn't show up, and Ms. Graham said she wanted to complete the training the following day [*id.*]. Mr. Ridge explained to Ms. Graham that he needed her to complete her routes on February 28, which is why he arranged for her to complete the training on February 27 [*id.* ¶ 18]. Mr. Ridge and Mr. Leinart warned Ms. Graham that if she didn't complete her assigned daily route, then it would be considered insubordination and CCCI would terminate her employment [*id.* ¶ 19]. Ms. Graham declined to complete the training on February 27 [*id.* ¶ 20]. She called in sick on February 28 [*id.*].

Mr. Ridge and Mr. Leinart informed Mr. Marty that Ms. Graham didn't complete the mandatory safety training [ECF 114-2 ¶ 26]. Mr. Marty decided to terminate Ms. Graham's employment due to insubordination because she refused to follow the directives of her supervisors and failed to complete the mandatory safety training by the deadline [ECF 114-2 ¶ 27]. She didn't complete the training until March 1 and 2, which was past the deadline [ECF 114-1 ¶ 20]. On March 10, 2018, CCCI terminated Ms. Graham's employment in accordance with its workplace conduct policy, which states that employees will be formally disciplined for insubordination, which includes termination [*id.* ¶ 28; ECF 114-3 ¶ 21].

On March 7, 2018, Ms. Graham emailed a complaint to Mr. Greenberg, alleging discrimination, retaliation, and racial bias [ECF 114-4 ¶ 24; *id.* Ex. 11]. In her email, she claimed that Mr. Ridge and Mr. Leinart intimidated her, bullied her, created a hostile work environment, and conspired to terminate her employment, all due to her race [*id.* ¶ 25]. She said that Mr. Ridge and Mr. Leinart subjected her to retaliation by threatening to terminate her employment for insubordination [*id.* ¶ 26]. She believed she was being mistreated in retaliation for her complaints about the reduction in her pay [*id.*]. She also claimed, in November 2017, that Mr. Ridge said that African-American male employees "all suck ass," are "worthless lazy motherf--kers," "do not do anything," and are "always f--king calling off work every damn holiday" [*id.* ¶ 27]. Mr. Greenberg forwarded the email to Ms.

4

Borella, who investigated the matter and found the claims to be unsubstantiated [*id.* ¶ 28; ECF 114-3 ¶¶ 22-28].

Ms. Graham filed a charge of discrimination with the Indiana Civil Rights Commission on April 5, 2018, alleging that CCCI discriminated against her on the basis of race, sex, age, and retaliation [ECF 1-1]. She received her right to sue letter on February 23, 2019 and filed suit on May 20, 2019 [ECF 1]. CCCI has now moved to dismiss Ms. Graham's complaint for failure to prosecute and dilatory conduct and alternatively for summary judgment on all claims. CCCI moved to strike several exhibits that Ms. Graham attached to her response because they weren't disclosed during discovery. Ms. Graham filed a motion to strike certain documents, though she doesn't clearly articulate what she is seeking to have stricken. These motions are now ripe for review.

STANDARD

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The non-moving party must present the court with evidence on which a reasonable jury could rely to find in his favor. *Beardsall v. CVS Pharmacy, Inc.*, 953 F.3d 969, 972 (7th Cir. 2020). The court must construe all facts in the light most favorable to the non-moving party, view all reasonable inferences in that party's favor, *Bellaver v. Quanex Corp.*, 200 F.3d 485, 491-92 (7th Cir. 2000), and avoid "the temptation to decide which party's version of the facts is more likely true," *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003); *see also Joll. v. Valparaiso Comty. Schs.*, 953 F.3d 923, 924 (7th Cir. 2020).

In performing its review, the court "is not to sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). Nor is the court "obliged to research and construct legal arguments for parties." *Nelson v. Napolitano*, 657 F.3d 586, 590 (7th Cir. 2011). Instead, the "court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a

trial." *Id.* The court must grant a summary judgment motion when no such genuine factual issue—a triable issue—exists under the law. *Luster v. Ill. Dept. of Corrs.*, 652 F.3d 726, 731 (7th Cir. 2011).

## DISCUSSION

A.  *Race, Sex, and Age Discrimination.*

Ms. Graham claims that CCCI discriminated against her on the basis of race and sex in violation of Title VII and on the basis of age in violation of the ADEA.[1] In her charge of discrimination, she complains that CCCI unlawfully reduced her pay, refused hardship funding, and terminated her employment. The question before the court is whether the evidence would permit a reasonable factfinder to conclude that Ms. Graham's race, sex, or age caused her termination or these other actions. *See Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 765 (7th Cir. 2016); *see also McDaniel v. Progress Rail Locomotive, Inc.*, 940 F.3d 360, 367 (7th Cir. 2019) (applying *Ortiz* to ADEA case). The court considers the evidence as a whole, regardless of whether it is "direct" or "indirect" evidence. *Ortiz*, 834 F.3d at 765.

"[T]he well-known and oft-used *McDonnell Douglas* framework for evaluating discrimination remains an efficient way to organize, present, and assess evidence in discrimination cases." *Johnson v. Advocate Health and Hospitals Corp.*, 892 F.3d 887, 894 (7th Cir. 2018). "There is no magic to this test; it is merely one way of culling the relevant evidence needed to demonstrate whether a reasonable factfinder could conclude that an employer engaged in an adverse employment action based on the plaintiff's race or other proscribed factor." *Id.* Under this framework, Ms. Graham must adduce evidence that (1) she is a member of a protected class, (2) she was meeting CCCI's legitimate expectations, (3) she suffered an adverse employment action, and (4) similarly situated employees who

---

[1] In the court's previous order denying CCCI's motion to dismiss, the court mentioned that Ms. Graham hadn't referred to her age and gender in a way that supports any age or gender discrimination claim in this case [ECF 19 at 6 n.2]. CCCI still moved for summary judgment on the age and gender discrimination claims. In this order, the court analyzes them in tandem with the race claim and ultimately reaches the same conclusion that the age and gender claims have no merit on this record.

were not members of her protected class were treated more favorably. *See McDaniel*, 940 F.3d at 368 (citation omitted). If she meets each element of her *prima facie* case, the burden shifts to CCCI to articulate a legitimate, nondiscriminatory reason for the adverse employment action, at which point the burden shifts back to Ms. Graham to submit evidence that CCCI's explanation is pretextual. *Id.* (citation omitted).

As CCCI points out, Ms. Graham's discrimination claims fail because she hasn't identified any similarly situated employees who were not members of her protected class (whether based on race, sex, or age) who were treated more favorably. *See id.* at 369 ("As [the plaintiff] has not identified any similarly situated employees to allow a factfinder to conduct a 'meaningful comparison,' his prima facie case for discrimination fails."); *Johnson*, 892 F.3d at 896 ("For purposes of Title VII, plaintiffs need to produce evidence that similarly situated non-African-American employees were treated more favorably. . . . And the plaintiffs have not done so."); *Faas v. Sears, Roebuck & Co.*, 532 F.3d 633, 642-43 (7th Cir. 2008) (plaintiff's disparate treatment argument was untenable because she failed to satisfy the similarly situated prong); *Gates v. Caterpillar, Inc.*, 513 F.3d 680, 690-91 (7th Cir. 2008) (same); *Burks v. Wis. Dept. of Transp.*, 464 F.3d 744, 751-52 (7th Cir. 2006) (same). Though CCCI moved for summary judgment, it was Ms. Graham's responsibility to make a showing sufficient to establish the existence of genuine triable issues. *See Johnson*, 892 F.3d at 896 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). In her response, Ms. Graham doesn't identify any similarly situated employees who were treated more favorably than her. For this reason, her discrimination claims fail under the *McDonnell Douglas* framework.

Under the *Ortiz* holistic approach, Ms. Graham's discrimination claims fare no better. Under *Ortiz*, the court must determine "whether the evidence would permit a reasonable factfinder to conclude" that Ms. Graham's race, sex, or age "caused the discharge or other adverse employment action." *Ortiz*, 834 F.3d at 765. The record contains scant evidence that CCCI's decisions to adjust her

pay, initially to deny her financial hardship application, and later to terminate her employment were due to her race, sex, or age.

Ms. Graham complains that her pay was reduced in January 2018 and that it was never corrected.[2] There is no evidence that this change in pay was due to her race, sex, or age. In December 2017, CCCI held a mandatory meeting to inform its employees of a change in pay structure from an hourly rate to a daily rate [ECF 114-2 ¶ 4]. On January 18, 2018, CCCI distributed the South Bend pay statements to all merchandisers, including Ms. Graham, which explained how the new daily rates were calculated [*id.* ¶ 10]. This change affected all merchandisers, regardless of age, sex, or race. When Ms. Graham met with Ms. Moeller, Mr. Keinsley, Mr. Marty, and Ms. Quinn to discuss her new pay rate, at no point did Ms. Graham say that her complaints regarding her pay were due to her race, sex, or age [*id.* ¶ 15]. On this record, no reasonable factfinder could conclude that her change in pay was the result of discrimination.

Ms. Graham complains that Ms. Moeller in Human Resources told her that she didn't qualify for the Coke Hardship Program. She says "she repeatedly tried for a month but, to no avail" [ECF 1-1]. She then acknowledges that she eventually got it done [*id.*]. The record shows that Ms. Borella and Mr. Marty encouraged Ms. Graham to apply for the Coke Hardship program [ECF 114-3 ¶ 11; ECF 114-2 ¶ 17]. She applied for the program, and CCCI in fact awarded her with financial assistance in the amount of $1,850.00 [ECF 114-4 ¶ 7; ECF 114-2 ¶ 19; ECF 114-3 ¶ 15]. Additionally, CCCI sponsored the music programs at her daughters' schools [ECF 114-2 ¶ 20; ECF 114-3 ¶ 15; ECF 114-4 ¶ 17]. No reasonable jury could find that CCCI discriminated against her with regard to the Coke

---

[2] Though not mentioned in her original complaint, Ms. Graham now also complains that CCCI changed her daily route [ECF 124 at 6]. However, even if part of the case, CCCI changed her route for business reasons, and the route change didn't affect her differently than any of the other merchandisers [ECF 114-1 ¶¶ 11-13; ECF 114-4 ¶¶ 19-20].

Hardship Program when CCCI did in fact award her the funding and also funded the music programs at her daughters' schools.

Ms. Graham complains that she was terminated for discriminatory reasons. However, Mr. Marty has said that he terminated Ms. Graham's employment due to insubordination because she refused to follow the directives of her supervisors and failed to complete the mandatory safety training by the deadline [ECF 114-2 ¶ 27]. Her termination was in accordance with CCCI's workplace conduct policy [*id.* ¶ 28; ECF 114-3 ¶ 21]. Ms. Graham's supervisor, Mr. Ridge, arranged for her to complete the mandatory safety training for the month of February on February 27, 2018 [ECF 114-1 ¶ 16]. When Ms. Graham didn't show up, Mr. Ridge and Mr. Leinart warned her that if she didn't complete her assigned daily route, then it would be considered insubordination and CCCI would terminate her employment [*id.* ¶ 19]. Ms. Graham still didn't show up [*id.* ¶ 20].[3] Ms. Graham hasn't submitted any evidence to show that CCCI's explanation for her termination is pretextual. For that reason, no reasonable factfinder could conclude that her race, sex, or age caused her termination.

Though it isn't mentioned in her complaint, in her response Ms. Graham says she considered a job transfer to Indianapolis; but, when she asked Mr. Leinart about it, he was "rude, racially bias, gender bias condescending, and a very arrogant person" [ECF 124 at 4]. Ultimately, though, she says she changed her mind and told Mr. Leinart that the job in Indianapolis wasn't for her. On this point then, there isn't discrimination because she hasn't alleged that CCCI took an adverse action against her. *See Ortiz*, 834 F.3d at 765 (employment discrimination claim requires "discharge or other adverse employment action"). Ms. Graham chose not to pursue the transfer.

Because Ms. Graham has not raised an issue of fact, even viewing the evidence in the light most favorable to her, the court grants summary judgment on the discrimination claims.

---

[3] In her response, Ms. Graham says there was no safety test to do, and that her safety test wasn't due until March 31, 2018 [ECF 124 at 6]. Here, it seems she may be confusing the issues. CCCI has explained that Ms. Graham didn't complete her February safety test on time. The March safety test is immaterial to this lawsuit.

B. *Retaliation.*

Title VII "prohibits various 'unlawful employment practices' involving discrimination on the basis of 'race, color, religion, sex or national origin.'" *E.E.O.C. v. CVS Pharm., Inc.*, 809 F.3d 335, 339 (7th Cir. 2015) (quoting 42 U.S.C. §§ 2000e-2, 2000e-3). The statute also prohibits retaliation against an employee "because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]." 42 U.S.C. § 2000e-3(a). The purpose of this anti-retaliation provision is to "prevent employer interference with 'unfettered access' to Title VII's remedial mechanisms . . . by prohibiting employer actions that are likely 'to deter victims of discrimination from complaining to the EEOC,' the courts, and their employers." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 346 (1997)). This prohibition "must be construed to cover a broad range of employer conduct." *Thompson v. N. Am. Stainless, L.P.*, 562 U.S. 170, 173 (2011). The pertinent inquiry is whether an employer has acted in a way that "might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* at 174 (citation omitted).

In a retaliation claim, a plaintiff may proceed under either the direct or indirect methods of proof. *See Swyear v. Fare Foods Corp.*, 911 F.3d 874, 885 (7th Cir. 2018); *Poullard v. McDonald*, 829 F.3d 844, 856 (7th Cir. 2016). Although this circuit has abandoned the distinction between "direct" and "indirect" evidence in discrimination claims, *see Ortiz*, 834 F.3d at 763-64, the separate methods have continued to apply in the retaliation context, *see Swyear*, 911 F.3d at 885. Still, the court avoids sorting evidence mechanically into two different piles—one "direct" and one "indirect"—and instead focuses on the overriding central inquiry: "could a reasonable trier of fact infer retaliation[?]"*Castro v. DeVry Univ., Inc.*, 786 F.3d 559, 564 (7th Cir. 2015); *accord Ortiz*, 834 F.3d at 765-66 (rejecting "convincing mosaic" as a legal test and rejecting "direct" and "indirect" distinction between evidence).

Ms. Graham claims that she was terminated in retaliation for reporting Mr. Ridge for racial discrimination. The indirect method reveals no triable issue. *See McDaniel*, 940 F.3d at 370-71. Under the *McDonnell Douglas* framework in the retaliation context, Ms. Graham must show (1) she engaged in protected activity; (2) she suffered a materially adverse employment action; (3) she was meeting CCCI's legitimate expectations; and (4) she was treated less favorably than similarly situated employees who did not engage in protected activity. *Id.* (quoting *Boss v. Castro*, 816 F.3d 910, 918 (7th Cir. 2016)). Ms. Graham substantiates no comparator on this record that would permit a reasonable jury's finding of retaliation.

Her retaliation claim thus must rely on the direct method. She must show that (1) she engaged in a protected activity; (2) she suffered a material adverse employment action; and (3) there was a causal connection between the protected activity and adverse employment action. *Swyear*, 911 F.3d at 885; *see also Burlington*, 548 U.S. at 57. She argues that CCCI retaliated against her because she complained to Mr. Greenberg that Mr. Ridge and Mr. Leinart bullied her and intimidated her [ECF 114-4 ¶¶ 24-25]. In her email, she also said Mr. Ridge had made derogatory comments about African-American men at the company [*id.* ¶ 27]. Ms. Graham sent her complaint in an email to Mr. Greenberg on March 7, 2018 [ECF 114-4 ¶ 24; *id.* Ex. 11]. CCCI terminated her employment three days later on March 10, 2018 [ECF 114-2 ¶ 28; ECF 114-3 ¶ 21].

Though the email came before her termination, the timing alone is insufficient to establish a genuine issue of material fact. *See McDaniel*, 940 F.3d at 369-70 (quoting *Kampmier v. Emeritus Corp.*, 472 F.3d 930, 939 (7th Cir. 2007)). This proves particularly true when her complaints concerned Mr. Ridge and Mr. Leinart, as communicated to Mr. Greenberg, but Mr. Marty made the decision to terminate her. She has presented no evidence to show this decisionmaker knew about her complaints or was influenced to terminate her because of her complaints against other individuals at the company. *See Johnson v. General Bd. of Pension & Health Benefits of United Methodist Church*, 733 F.3d 722, 733 (7th

Cir. 2013) ("decision-maker[] would need to have known about [plaintiff's] discrimination complaints for [plaintiff] to prevail [on retaliation claim]"); *Brown v. Advocate S. Suburban Hosp.*, 700 F.3d 1101, 1108 (7th Cir. 2012) ("No affirmative evidence suggests that the decision-makers were even *aware* of the plaintiffs' discrimination complaints before they denied the transfers, much less that they did so intending to retaliate against the plaintiffs."). That is particularly true when Mr. Marty terminated her because she violated CCCI's workplace policy by failing to complete her mandatory safety training by the end of the month—something that she failed to complete and that he then discovered before she ever made a complaint. She hasn't produced evidence from which a reasonable jury could find a causal connection between the email she sent to Mr. Greenberg and her termination by Mr. Marty. For these reasons, the court grants summary judgment on the retaliation claim.

    C.    *Motion to Dismiss and Motions to Strike.*

CCCI filed a motion to dismiss Ms. Graham's complaint under Fed. R. Civ. P. 41(b) for failure to prosecute and dilatory conduct. Because the court has now decided this case on summary judgment, the court denies the motion to dismiss as moot.

Additionally, CCCI filed a motion to strike exhibits attached to Ms. Graham's response brief to its motion for summary judgment. Specifically, CCCI seeks to strike Ms. Graham's exhibits A, H, J, L, M, and N because they weren't produced during the discovery phase. Ms. Graham didn't respond to the motion to strike. "Motions to strike are heavily disfavored, and usually only granted in circumstances where the contested evidence causes prejudice to the moving party." *Rodgers v. Gary Cmty. Sch. Corp.*, 167 F. Supp.3d 940, 948 (N.D. Ind. 2016); *see also Olson v. Morgan*, 750 F.3d 708, 714 (7th Cir. 2014); *Kuntzman v. Wal-Mart*, 673 F. Supp.2d 690, 695 (N.D. Ind. 2009). These particular

exhibits had no bearing on the summary judgment outcome,[4] so the court sees it as unnecessary to strike them. Accordingly, the court denies the motion to strike.

Ms. Graham filed a motion to be stricken documents. In the motion, she doesn't identify any particular documents that she seeks to strike. The court denies the motion.

## CONCLUSION

Construing all facts and reasonable inferences in favor of DeAnn Graham, the court GRANTS the defense's summary judgment motion [ECF 111], DENIES AS MOOT the motion to dismiss for failure to prosecute and dilatory conduct [ECF 109], and DENIES the motion to strike [ECF 128] and the motion to be stricken documents [ECF 130]. The court DIRECTS the entry of judgment for CCCI. This order terminates the case.

SO ORDERED.

October 27, 2021                              *s/ Damon R. Leichty*
                                              Judge, United States District Court

---

[4] Exhibit A pertains to a safety training in January 2018, which wasn't at issue in this lawsuit [ECF 118-1, Ex. A]. Ms. Graham failed to attend the safety training in February 2018. Exhibit H includes emails regarding Ms. Graham's request for information about merchandiser positions in Indianapolis [ECF 118-1, Ex. H]. These emails don't bear on whether CCCI discriminated or retaliated against her. Exhibit J is a blurb about color of law violations [ECF 118-1, Ex. J]. This is irrelevant. Exhibit L is a definition page for the phrase "take it on the chin" [ECF 119, Ex. L]. This document has no bearing on the lawsuit, and Ms. Graham provides no evidence that Mr. Ridge used the phrase "take it on the chin." Exhibit M is an excerpt from a Wall Street Journal article about Coca-Cola's diversity efforts [ECF 119, Ex. M]. Coca-Cola is a separate entity from Coca-Cola Consolidated, Inc., and this article says nothing about whether CCCI discriminated or retaliated against Ms. Graham. Exhibit N is a screenshot that depicts the route from the Martin's in Elkhart to the Martin's in Granger [Ex. 122-1, Ex. N]. This is irrelevant.